# THE DISTRICT COURT OF GUAM

| | |
|---|---|
| RUSS CARLBERG, ROEL D. DACASIN, REYNALDO S. GALVEZ, DELMARIO R. CORTEZ, and GARY CHANG,<br><br>Plaintiffs,<br><br>vs.<br><br>GUAM INDUSTRIAL SERVICES dba GUAM SHIPYARD and MATHEWS POTHEN, Personally,<br><br>Defendants. | CIVIL CASE NO. 14-00002<br><br>**ORDER RE: MOTIONS FOR SUMMARY JUDGMENT; MOTION TO STRIKE JURY DEMAND** |

The parties have filed opposing motions for summary judgment in this case involving allegations of failure to provide adequate notice of employment termination under the federal Worker Adjustment and Retraining Notification ("WARN") Act, 29 U.S.C. §§ 2101 *et seq*. *See* ECF Nos. 162, 172. Defendants have added a motion to strike Plaintiffs' jury demand. *See* ECF No. 166. The issues have been fully briefed and the court has determined oral argument is unnecessary. *See* ECF No. 219. Having considered the motions, the supporting submissions, and the relevant authority, the court **DENIES** Plaintiffs' motion for summary judgment (ECF No. 162); **DENIES** Defendants' motion for summary judgment (ECF No. 172); and **DENIES** Defendants' motion to strike Plaintiffs' jury demand (ECF No. 166).

## I. FACTUAL AND PROCEDURAL BACKGROUND

For many years, Defendants Guam Industrial Services and Mathews Pothen ("Defendants") operated a ship repair facility at Apra Harbor in Santa Rita, Guam. ECF No. 1 ¶¶ 16, 23; ECF No. 174 ¶¶ 2–3. The facility was located within the U.S. Naval base in Santa Rita and served as a combined ship repair facility and marine industrial center. ECF No. 174 ¶ 3. Defendants began operating the facility in 1997, entering at that time a long-term sublease with the Guam Economic Development Authority (GEDA), which had leased the facility from the federal government. *Id*. ¶ 7.

Over the next fifteen years, Defendants provided a variety of marine services at the facility, including repair services, material and fabrication services, and dry-docking services, for various military, government, and commercial vessels sailing via Guam. *Id*. ¶¶ 9-10, 12. Defendants provided additional industrial and technical support services across Guam. ECF No. 1 ¶ 17. In 2012, Defendants' original lease term for the facility expired. ECF No. 174 ¶ 16. They sought and received a one-year extension of the term from the U.S. Navy, which had re-taken control of the site from GEDA and was at the time seeking proposals for a new long-term lease of the facility. *Id*. ¶ 16. At around the same time, Defendants entered an "Indefinite Delivery, Indefinite Quantity" (IDIQ) contract with the Navy's Military Sealift Command (MSC), so as to provide services for any emergent Navy ship repair work in Guam. *Id*. ¶ 17.

In early 2013, in the midst of Defendants' one-year extension, MSC solicited new repair contract proposals for long-term operation of the facility. *Id*. ¶ 21. Defendants, having done significant business under a prior naval repair contract, sought the new contract and submitted a bid. *Id*. ¶ 22. The procurement process lasted approximately seven months, as MSC held on-going negotiations with Defendants and at least one other competitor bidding on the contract. *Id*. ¶¶ 23-24.

Eventually, after engaging in those various negotiations, MSC awarded the contract to Defendants' competitor, Cabras Marine Corporation (Cabras), on October 11, 2013. *Id*. ¶ 23; ECF No. 164 ¶ 7. At or around the same time, MSC gave Defendants notice they were to vacate the repair facility premises immediately and they would receive no new work under the IDIQ contract. ECF No. 174 ¶ 24.

Faced with the financial implications of those MSC decisions, Defendants quickly decided to terminate all employees not essential for transition out of the facility. *Id*. ¶ 29. On the morning of October 15, Defendants gave at least one hundred and fifty employees, including the named Plaintiffs, written notices of termination, effective immediately. *Id*. ¶¶ 29-30; ECF No. 164 ¶¶ 8, 14. The short standard-form notice explained that Defendants were "not awarded the contract to provide ship repair services for [MSC] at the former [ship repair facility" and that Plaintiffs' employment was terminated effective that day, October 15. ECF No. 163 at 144. The notice added that Defendants had contacted a career services center to aid Plaintiffs and others laid off in accessing various job transition services and programs. *Id*.

Plaintiffs initiated this lawsuit in late January 2014 and demanded a jury trial, contending the abrupt terminations and the abbreviated termination notices constituted violations of the WARN Act—which generally requires that employees receive at least sixty days, and substantive, notice before any mass termination event—and gross negligence. ECF No. 1. They later added claims of negligence per se. ECF No. 98. The court eventually dismissed the claims of gross negligence and negligence per se, concluding WARN Act violations could not serve as the basis for those claims. ECF No. 153. Plaintiffs then moved for summary judgment on the WARN Act claims, contending the record demonstrates that Defendants violated the Act and cannot establish any defenses that might offer relief from the Act's notice requirements. ECF No. 162. Defendants opposed and offered their own motion for summary judgment, conceding

3

the mass termination constituted a "WARN-triggering" event but maintaining that the record demonstrates they qualify for two statutory defenses relieving them of liability for failure to comply with the standard WARN notification requirements. ECF Nos. 172, 173. Defendants added a motion to strike Plaintiffs' jury demand, contending WARN Act claims must be construed as claims for "equitable restitutionary relief" and therefore cannot provide Plaintiffs a right to trial by jury. ECF No. 166.

## II. LEGAL STANDARDS

*A. Summary Judgment.*

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the non-moving party, demonstrates there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FRCP 56(a). A fact is material if it might affect the outcome of the suit under the governing substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

The standard governing a cross motion for summary judgment is the same as the standard governing motions for summary judgment—the court must consider each motion on its own merits. *See Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). Assertions by both parties that there are no genuine issues of material fact does not vitiate the court's responsibility to determine whether disputed issues of material fact are present, and summary judgment cannot be granted where a genuine issue as to any material fact exists. *See United States v. Fred A. Arnold, Inc*., 573 F.2d 605, 606 (9th Cir. 1978) (per curiam).

*B. Jury Demand.*

Under Federal Rule of Civil Procedure 39(a), after a party has timely demanded a jury trial as Plaintiffs have here, the court may, "on motion or on its own, find" there is no federal

right to a jury trial under the Constitution or the relevant statutory provisions. Fed. R. Civ. P. 39(a)(2); *see Craig v. Atl. Richfield Co*., 19 F.3d 472, 477 (9th Cir. 1994) ("[T]he court may . . . remove a case from the jury docket if it finds that the right to a jury trial did not exist under a statute or the Constitution.").

### III. DISCUSSION

*A. WARN Act*.

The WARN Act aims to give employees working for large employers advance notice of layoffs so as to allow time to adjust to the loss of employment, to seek and obtain alternative employment and, where necessary, to seek appropriate retraining for the job market. *See Alarcon v. Keller Industries,* 27 F.3d 386, 388 (9th Cir. 1994), 20 C.F.R. § 639.1(a). In promoting that goal, the Act generally requires that covered employers give affected employees sixty days written notice of any plant closure or mass layoff. 29 U.S.C. § 2102(a); *Alarcon*, 27 F.3d at 388. But the Act also allows for "reduction of the notification period" in certain exceptional circumstances and sets forth several categories of exception, two of which Defendants contend apply here. *See* 29 U.S.C. § 2102(b)(1)-(3). One potentially applicable exception, often called the "unforeseeable business circumstances" exception, permits a reduced notice period if a layoff is caused by business circumstances not reasonably foreseeable at the time notice would normally be required. *Id*. § 2102(b)(2)(A); *see also Alarcon*, 27 F.3d at 388–89. A second exception, called the "faltering business" exception, permits a reduced notice period when an employer is "actively seeking capital or business" to avoid or postpone the layoff and reasonably believes giving notice would prevent the employer from obtaining the necessary capital or business. 29 U.S.C. § 2102(b)(1); *Alarcon*, 27 F.3d at 388–89.

*B. Notice.*

Before taking up the question of whether either of these exceptions applies here, the court

notes the Act does not eliminate the notice requirements altogether for employers facing exceptional circumstances. *See, e.g., Weekes-Walker v. Macon Cty. Greyhound Park, Inc.*, 877 F. Supp. 2d 1192, 1205 (M.D. Ala. 2012) (rejecting interpretation of WARN that "makes room for a scenario where the giving of § 2102(b)(3) notice can be excused altogether and the employer can nevertheless rely on one of the defenses"); *see also Alarcon*, 27 F.3d at 389. Instead, when an employer reduces the notice period under one of the statutory exceptions, the Act requires that the employer "give as much notice as is practicable" (the timing requirement) and, at the time notice is actually given, requires that the employer "provide a brief statement of the reason for reducing the notification period," (the substance requirement) in addition to the various other notice requirements set forth by regulation. 29 U.S.C. § 2102(b)(3); *Alarcon*, 27 F.3d at 389. Even where one of the statutory exceptions applies, in other words, an employer may be liable for the various penalties the Act contemplates for failure to comply with its requirements for reduced notice scenarios. *See, e.g., Childress v. Darby Lumber Inc.*, 126 F. Supp. 2d 1310, 1317 (D. Mont. 2001), aff'd, 357 F.3d 1000 (9th Cir. 2004) ("Darby Lumber would still be liable even if any of the exceptions applied because its notice was inadequate."). The parties dispute whether Defendants' short standard-form notice of termination given on the morning of October 15, 2013—four days after competitor Cabras had been awarded the new MSC contract—satisfied either of the Act's timing and substance requirements.

With respect to timing, various courts have observed determinations of what constitutes a "practicable" period for purposes of notice is "necessarily fact-intensive." *See, e.g., Serv. Employees Int'l Union Local 6 v. Andrews Int'l, Inc.*, 2013 WL 12107630, at *4 (W.D. Wash. July 25, 2013). The practicability determination, the court notes, must examine both any delays an employer undertakes in giving notice, and the period of notice actually given before termination. *Id*. Regarding the former, a delay of even a week in giving notice after receipt of

layoff-triggering information may be too long under certain circumstances—even where several weeks' notice of the impending layoff is then actually given. *See, e.g.,* W*holesale and Retail Food Distrib. Local 63 v. Santa Fe Terminal Services, Inc.*, 826 F. Supp. 326, 333 (C.D. Cal 1993). In other scenarios, a week- or even month-long delay might be appropriate, so as to allow an employer time to determine how best to respond to unfavorable news before giving notice. *See, e.g., Roquet v. Arthur Andersen LLP*, 398 F.3d 585, 589-90 (7th Cir. 2005); *United Steel Workers of Am. Local 2660 v. U.S. Steel Corp.*, 683 F.3d 882, 885 (8th Cir. 2012). And with respect to the period of notice actually given, the courts have explained, just a day's notice or less may be all that is practicable—as, for example, in the case where company learns of the loss of 95% of its business only the day before notice is given. *See In re Advanced Accessory Sys.*, 443 B.R. 756, 766 (Bankr. E.D. Mich. 2011); *Hotel Employees & Rest. Employees Int'l Union Local 54 v. Elsinore Shore Assocs.*, 173 F.3d 175, 187 (3d Cir. 1999) (noting "notice period may be reduced or eliminated" in event unforeseeable business circumstance arises); *In re Old Electralloy Corp.*, 162 B.R. 121, 126 (Bankr. W.D. Pa. 1993) ("[N]otice was not given until the day of closing. However, the decision to close, caused by the exhaustion of available cash, was made only late the night before closing. The notice was short, but there was no opportunity for greater notice."). The upshot, of course, is that the practicability determination is heavily fact-driven. *See Andrews Int'l*, 2013 WL 12107630, at *4.

Here, numerous fact questions remain as to what may have been practicable under the circumstances. As part of their argument, Defendants suggest Plaintiffs, and all the laid-off employees, had effective notice of an impending layoff well before the October 15 written notice was given, based on daily and weekly employee meetings with the foremen at the facility. *See, e.g.,* ECF No. 176 at 2. What precisely each employee was told and when, however, remain unanswered—and the employees themselves have apparently given conflicting accounts.

7

*Compare, e.g.,* ECF No. 163 Exh. H at 8 (employee Dacasin confirming he understood "months before" that he might lose his job); *with id.* Exh. C at 8 (employee Camacho confirming she could not recall any Guam Shipyard management discussing possibility of losing the MSC contract with employees). And what, exactly, spawned the four-day delay between notice of the MSC award to Cabras and notice of termination to the employees remains an open question as well. It may be that Defendants needed all that time to weigh options, or it may be that Defendants could have given the employees a few extra days—and as the Act makes clear, each day matters. *See, e.g.,* 29 U.S.C. § 2104(a)(1)(A) (allowing "back pay for each day of violation."); *accord Alarcon*, 27 F.3d at 389 (explaining it "will often be a difficult decision whether there was adequate cause for shortening the notice period"). Given those and other open questions regarding both delay and the length of notice actually given, and given the varying inferences a factfinder might draw from the ambiguous record, the court cannot conclude summary judgment is appropriate on the question of practicability.

Turning to the substance requirement for cases involving the reduced notification exceptions, the *Alarcon* court explained that in addition to the basic notice requirements set forth by regulation, any reduced notice under the statute must "give some indication of the factual circumstances that made an exception to the statutory notice requirement applicable, providing an adequate, specific explanation to affected workers." *Alarcon*, 27 F.3d at 390. The explanation might well be brief, but it must nonetheless provide some "understanding of the underlying conditions or state of affairs causing the shortened notice." *Id.* Other courts have observed that defective notice need not be equated with no notice; the determination of whether adequate substance has been conveyed requires "a practical and realistic appraisal of the information given to affected employees." *See, e.g., Kalwaytis v. Preferred Meal Sys., Inc.*, 78 F.3d 117, 121–22 (3d Cir. 1996). And embracing this requirement of "pragmatic" evaluation,

the courts have explained that an employer may, at times, appropriately rely on a combination of written and oral communication, as well as external publicity, to adequately convey the requisite information under the Act to employees. *See, e.g., Andrews Int'l*, 2013 WL 12107630, at *6; *accord Saxion v. Titan C-Manufacturing, Inc.*, 86 F.3d 553, 561 (6th Cir. 1996) ("That the notice was deficient ... does not change the fact that ten days before the plant was closed, the affected employees clearly knew that it was going to be closed.").

Surveying the record here, the court concludes that much as it is for purposes of the timing question, the record on the substance question is ambiguous. The written notice alone was surely not enough—it explained only that Defendants were not awarded the MSC contract, and that the employees were terminated. *See, e.g.,* ECF No. 163 Exh. K. That language provided perhaps minimally sufficient explanation regarding the circumstances giving rise to the layoffs, but it provided no explanation, as required by *Alarcon*, of why the notification period had been entirely eliminated. *See Alarcon*, 27 F.3d at 390–91 (noting concern where notice did "not clearly explain how the circumstances caused the notice period to be shortened"). It may be, however, that as Defendants contend, additional "important corporate and business information was transmitted by word of mouth either from supervisors to employees or directly from upper management during periodic all hands meetings." *See* ECF No. 174 at 6; *see also Andrews Int'l*, 2013 WL 12107630, at *7 (noting defendant might provide adequate brief statement by "cumulative effect" of multiple communications over time). Or it may be that, as Plaintiffs point out, Defendants simply had no idea the WARN Act existed at the time, or thought it inapplicable, and "at no time during the bid process for solicitation . . . did [Defendants] inform, warn, discuss, or otherwise communicate to Plaintiffs that their continued employment was at risk due to the issuance of the [MSC] solicitation," and some or all of the employees remained largely in the dark both until and after October 15. *See, e.g.,* ECF No. 162

at 4; ECF No. 164 at 2; ECF No. 173 at 20; ECF No. 177 at 3; *see also Weekes-Walker,* 877 F. Supp. 2d at 1209 (concluding notice was deficient where WARN Act was never mentioned and specific defenses under the Act were never mentioned). Given those and other open questions regarding the substance of the notice actually given and received, and given the varying inferences a factfinder might draw from the ambiguous record, the court cannot conclude summary judgment is appropriate on the question of whether Defendants provided adequate substance in giving their termination notices.

Because there remain genuine issues of material fact regarding the adequacy of the notice—in terms of both timing and substance—the court cannot conclude Plaintiffs or Defendants are entitled to summary judgment on the question of notice. The court will deny the motions with respect to this issue.

*C. Unforeseeable Business Circumstances.*

Regardless whether Defendants can establish they satisfied the Act's requirements for shortened notice here, they must also establish they actually qualified for one of the statutory exceptions at the time the standard sixty-day notice would have been required. *See Loehrer v. McDonnell Douglas Corp.*, 98 F.3d 1056, 1060 (8th Cir. 1996) (noting employer bears burden of showing existence of conditions giving rise to an exception).

With respect to the "unforeseeable business circumstances" exception, the Department of Labor has provided guidance for determining when the exception applies. *See* 20 C.F.R. § 639.9(b). Circumstances may have been unforeseeable, the agency observes, if caused by "sudden, dramatic, and unexpected action," outside an employer's control. *Id.* Sudden and unexpected termination of a major contract, or a strike at a major supplier, or a dramatic downturn, might all constitute the kind of "sudden, dramatic, and unexpected action" that would satisfy the exception. *Id.* In making the determination, the agency has explained, courts are to

evaluate whether similarly situated employers, exercising reasonable business judgment in predicting the demands of the particular market, could have foreseen the circumstances causing the layoff. *Id*. § 639.9(b)(2); *see also Roquet* 398 F.3d at 588. An employer will not typically be liable, in other words, if when confronted with potentially devastating financial news, it reacts just as other reasonable employers in its market would react. *See Roquet*, 398 F.3d at 588. But as in most cases involving tests of reasonable foreseeability, per se rules are to be discouraged; the determination is again heavily fact-driven. *Pena v. Am. Meat Packing Corp.*, 362 F.3d 418, 421 (7th Cir. 2004).[1]

Attempting to further refine the foreseeability inquiry, various courts have observed the distinction between foreseeability and unforeseeability may be understood as a distinction between probability and possibility—an employer's recognition of the possibility of a layoff-triggering event, in other words, will not render the statutory exception inapplicable, but recognition of probability will. *See, e.g., Roquet*, 398 F.3d at 589. Others add that the Act is intended to allow leeway for an employer's exercise of reasonable business judgment, and the regulations are designed to encourage employers to take various reasonable actions to preserve jobs. *See In re Flexible Flyer Liquidating Trust*, No. 12–60242, 2013 WL 586823, at *4 (5th Cir. February 11, 2013) (unpublished). And, as still other courts have observed, the "rather unique, politically charged area of defense contracts" may call for an even more refined foreseeability inquiry, because reasonable defense contractors may often have good reason to believe they will retain or procure business where the government has expressed a specific need. *See, e.g., Loehrer,* 98 F.3d at 1062.

---

[1] The court notes the "unforeseeable business circumstances" defense also carries a causation requirement—an employer must establish the terminations were caused by the adverse circumstances. *See* 29 U.S.C. § 2102(b)(2)(A); *Roquet v. Arthur Andersen LLP*, 2004 WL 609314, at *5 (N.D. Ill. Mar. 23, 2004), aff'd, 398 F.3d 585 (7th Cir. 2005). The parties have not, however, given the requirement significant attention, and given the remaining fact questions regarding foreseeability, the court need not address causation further here.

11

Application of those principles here illuminates various unresolvable fact questions—questions a reasonable factfinder might decide either way. Neither side has offered much evidence of what a similarly situated employer would have done in these circumstances, and the court recognizes Defendants have the burden of establishing unforeseeability. *See* 20 C.F.R. § 639.9. But as Defendants point out, they may have been, and a similarly situated DOD contractor may have been, reasonably confident they would win the MSC contract based on past performance and experience with the Navy, retention of a workforce familiar with the Navy's needs, and the post-bid negotiations. ECF No. 174 at 6; *see also Loehrer*, 98 F.3d at 1062 (highlighting "upbeat negotiations" as consideration in foreseeability analysis). And the decisions to require Defendants to vacate the premises immediately upon award of the contract to Cabras, and to forego any additional work under the IDIQ contract may well have come as a surprise to any similarly situated DOD contractor, given the business and strategic sense it may have made for both sides to manage the transition more smoothly. ECF No. 176 at 5–6; *accord Loehrer*, 98 F.3d at 1062; *see also Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Gen. Dynamics Corp.*, 821 F. Supp. 1306, 1312 (E.D. Mo. 1993). Or, as Plaintiffs point out, it may be that Defendants were, and should have been, well aware of the probability of losing the contract and the consequences for the employees, because as Defendant Pothen conceded, the "[e]mployees were informed of the importance of obtaining the contract and the consequences" of losing the contract, Defendants had very little work for the entirety of the procurement process, and Defendants had "full realization" of the various looming risks. *See* ECF No. 174 at 5–6, 10. Moreover, as Plaintiffs note, that Defendants had not previously engaged in and failed in the procurement process in this way cannot be dispositive, because a similarly situated similar employer may well have recognized both the probability of losing the contract to Cabras and the probability of an abrupt order to vacate the premises. *See, e.g., Pena*, 362 F.3d at 422 ("[E]ven

though Ochylski and Espinosa had not previously experienced a plant shutdown due to USDA withholding of inspection following its issuance of multiple NRs, a reasonable, similarly situated business person might have foreseen that the new USDA rules would result in such actions[.]").

Given these clearly fact-driven disputes regarding the probability of the outcomes here and the ways in which similarly situated employers may have viewed and responded to them, the court cannot conclude Plaintiffs or Defendants are entitled to summary judgment on the question of qualification for the unforeseeable business circumstances exception, and the court will deny the motions on this issue.

*D. Faltering Company*.

Defendants add that even if they cannot establish unforeseeable business circumstances, they may be excused from the Act's notice requirements as a "faltering company." To avail themselves of this defense, Defendants must establish that at the time notice would have been required: (1) they were actively seeking capital or business; (2) the capital or business, if obtained, would have enabled them to avoid or postpone the facility closure; and (3) they reasonably and in good faith believed that giving the generally-required sixty-day notice would have prevented them from obtaining the capital or business. *See* 29 U.S.C. § 2102(b)(1). The implementing regulations add the requirements that Defendants show there was "a realistic chance of getting" the capital or business, and that they "objectively demonstrate" the reasonable belief that capital or business would have been unavailable if the generally-required notice had been given. 20 C.F.R. § 639.9(a).

The defense, the regulations note, is to be narrowly construed. *Id*. The cases examining this defense have reiterated the narrow scope of its potential application and have highlighted the "actively seeking" language—concluding that Congress included the word "actively" "in the statute for a reason," and that thus on the day notice would have otherwise been required, an

employer must have actually been seeking additional financing or business to keep the company afloat. *See In re APA Transp. Corp. Consol. Litig.*, 541 F.3d 233, 249 (3d Cir. 2008); *see also* 20 C.F.R. § 639.9(a)(1). Waiting, contemplation, and speculation in light of some prior solicitation will not satisfy the requirement; an employer must point to and establish identifiable steps taken to secure additional financing or business on the relevant day or be subject to liability. *See id.*; *United Paperworkers Int'l Union, AFL-CIO, CLC v. Alden Corrugated Container Corp.*, 901 F. Supp. 426, 441 (D. Mass. 1995) (emphasizing concern that "there [wa]s no evidence in the record with respect to what specific steps Alden was taking to seek new business" on the day notice would have been required).

The record on this faltering company question is no clearer than the record on unforeseeable circumstances. As Plaintiffs point out, Defendants may have been taking no steps to actively seek additional financing or business in August 2013 (at the time notice would have been required), because they had submitted the MSC bid back in June. *See* ECF No. 209 at 13; *see also In re APA Transp. Corp.* 541 F.3d at 249 (concluding single solicitation of financing and waiting on result two months later cannot satisfy the "actively seeking" requirement); *In re Jevic Holding Corp.*, 496 B.R. 151, 160 (Bankr. D. Del. 2013). Even were they actively seeking capital, they may not have believed in good faith at the relevant time that giving of adequate notice would have prevented them from securing additional financing or business, because as they conceded, they never actually discussed WARN, never considered it in the decision-making process, and may not have known what it was. *See* ECF No. 209 at 14; *see also Childress*, 126 F. Supp. 2d at 1317 ("[I]t is a stretch to say whether Darby Lumber can claim any good faith argument for lack of providing notice when it was unaware that sixty-day notice was required."). And, as Plaintiffs note, Defendants concede they had not actually discussed financing possibilities with their own financing institutions until after the terminations were made. *See*

ECF No. 209 at 15. But as Defendants note, there were several post-bid negotiations on the MSC contract, and they may well have reasonably and in good faith believed that any notice of termination prior to the award of the contract could have disqualified them from consideration. *See* ECF No. 174 at 6, 9–10; *cf. Elsinore Shore Assocs.*, 173 F.3d at 185 n.7 (noting dangers of overestimating risks of closing and premature warning, including risk that warning harms "precisely those persons WARN attempts to protect").

The record on the "active seeking" and "reasonable and good faith belief" questions is sparse at best, and the court recognizes Defendants again bear the burden of proving they have met the conditions necessary for application of a notice exception. *See* 20 C.F.R. § 639.9. But even on this record, a reasonable factfinder might resolve the questions either way, and thus the court cannot conclude Plaintiffs or Defendants are entitled to summary judgment on the question of qualification for the faltering company exception. *See, e.g., United Paperworkers*, 901 F. Supp. at 442 (finding, only after case was tried to court on stipulated facts, that employer had failed to establish qualification for the exception). The court will therefore deny the motions on this issue.

*E. Jury Demand.*

These lingering fact questions tee up the related question of whether the Seventh Amendment's guarantee of a right to jury trial in "[s]uits at common law" confers a jury trial right for claims arising under the WARN Act (the Act itself is silent with respect to the jury trial question). *See* U.S. Const. amend. VII. The courts have not often examined the question; when they have, they have split as to the answer. *See Bledsoe v. Emery Worldwide Airlines, Inc.*, 635 F.3d 836, 840 (6th Cir. 2011) (collecting cases and noting split). The Supreme Court has explained the Seventh Amendment will generally apply to actions enforcing statutory rights as long as the statute creates legal rights and remedies—to be distinguished from statutes protecting

equitable rights and remedies alone. *See Curtis v. Loether,* 415 U.S. 189, 193 (1974). Whether a statute creates legal rights and remedies, the Supreme Court has observed, is typically to be determined by: (1) comparing the statutory action to 18th-century actions brought prior to the merger of courts of law and equity; and (2) examining whether the remedy sought is more appropriately characterized as legal or equitable "in nature." *Wooddell v. Int'l Bhd. of Elec. Wkrs., Local 71*, 502 U.S. 93, 97 (1991). The second inquiry is "the more important" inquiry and provides the focus for analysis here because, as the *Bledsoe* court and various others have recognized, no WARN Act analogue was known to 18th-century England. *Bledsoe*, 635 F.3d at 841.

In examining the nature of the WARN Act remedy, the *Bledsoe* court—the only federal appellate court to have addressed the question thus far—noted several guiding considerations on its way to a conclusion the Act offers only an equitable remedy. *Id*. at 843. First, the court explained, the Act's remedies restore the pay and benefits an employer "should have provided" its laid off employees during the sixty-day notice period. *Id*. That kind of remedy, the *Bledsoe* court opined, is "restitutionary in nature" and distinguishable from "compensation for discriminatory or otherwise wrongful termination," which suggests the remedy should thus be characterized as equitable. *Id*. Second, the Act makes the entire amount of the remedy discretionary—a factor the Supreme Court has previously explained may counsel in favor of an equitable characterization. *Id*.; *see also Albemarle Paper Co. v. Moody*, 422 U.S. 405, 443 (1975) (Rehnquist, J., concurring). And third, the *Bledsoe* court observed, other superficially similar statutes like the Family Medical Leave Act, 29 U.S.C. § 2601 *et seq.*, which had been widely interpreted to offer a jury trial right, had different histories and explicitly offered both "equitable relief" and "damages," signaling a legislative intent potentially at odds with the intent signaled by the WARN Act enforcement provisions, which make no mention of "damages."

16

*Bledsoe*, 635 F.3d at 843.

But whether those observations reveal much is doubtful. Our own appellate guidance on the question of the nature of the WARN Act remedy points in the other direction: the Ninth Circuit has described the remedy as "a make-whole compensatory remedy," has noted the Act has various "punitive" qualities, and has explained that "damages under the Act should compensate employees for the money they would have earned but for the premature closure in violation of the WARN Act." *Local Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc*., 244 F.3d 1152, 1159 (9th Cir. 2001). Compensatory damages are, of course, a classic legal remedy, suggesting the *Las Vegas Sands* court may well have understood the WARN Act remedy as legal. *See, e.g., Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 570 (1990); *see also* Restatement (Third) of Restitution and Unjust Enrichment § 4 rptr. note c (2011) ("Restatement Third").

The *Bledsoe* court attempted to dismiss this classic understanding of compensation in two ways, noting other statutes offering "back pay" (as the WARN Act does) have been characterized as offering equitable relief, and observing the Act's remedy for "back pay and benefits that should have been paid" may sound like a kind of restitution, which has often been characterized as an equitable remedy. *Bledsoe*, 635 F.3d at 843. In other statutes offering "back pay" as a remedy, however, Congress has explicitly characterized the remedy as "equitable"—a characterization conspicuously absent from the WARN Act's remedy provisions. *See Terry*, 494 U.S. at 572. And whether "back pay and benefits that should have been paid" may best be characterized as restitutionary disgorgement of an employer's wrongful gain is debatable: as one court has observed, the purpose of the Act is to provide notice so employees might more successfully transition, the Act's damages award aims to remedy the loss of that opportunity, and the employer has not typically "obtained any gain by its failure to comply with the Act." *Bentley*

17

*v. Arlee Home Fashions, Inc.*, 861 F. Supp. 65, 68 (E.D. Ark. 1994); *see also Alarcon*, 27 F.3d at 388 (noting WARN Act's purpose "is to ensure that workers receive advance notice of plant closures and mass layoffs that affect their jobs . . . [which] provides workers with time to adjust to their loss of employment, to seek and obtain alternative jobs, and where necessary, to seek retraining . . ."). Regardless, characterizing the remedy as restitutionary provides little, if any, actual guidance as to whether the remedy is legal or equitable. *See, e.g.,* Restatement (Third) § 4 cmt. c (noting "widespread error" in "the assertion that a claim in restitution or unjust enrichment is by its nature equitable rather than legal" and noting courts may often from that "false premise . . . conclude . . . that there is no right to jury trial of a particular issue"); *accord Great-West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 229 (2002) (Ginsburg, J., dissenting) ("[O]ur cases have invariably described restitutionary relief as 'equitable' without even mentioning, much less dwelling upon, the ancient classifications [between law and equity] on which today's holding rests.").

Instead, other considerations provide clearer guidance. That Congress explicitly prohibited injunctive relief in the Act suggests the Act's remedies were not originally understood as entirely equitable, given the widely-held understanding of injunctive relief as "a traditional equitable remedy." *See Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 864 (9th Cir. 2017). The absence of any WARN Act reference to equity buttresses the point. *Compare, e.g., Terry*, 494 U.S. at 572 (highlighting Congress's "specific" characterization of backpay under Title VII as "equitable relief"). And the Act's legislative history bolsters the understanding more directly; as opponents observed in floor debate, "[t]his legislation . . . includes the right to a jury trial . . . [and we] have to question whether the publicity, deliberations, and outcome of a jury trial under these circumstances would be truly objective and fair." *Bentley*, 861 F. Supp. at 67 (quoting 134 Cong. Rec. S8598-01 (daily ed. June 27, 1988) (statement of Sen. Orrin Hatch)); *see also Creech*

*v. Virginia Fuel Corp.,* 61 F. Supp. 3d 592, 594 n.1 (W.D. Va. 2014).

Similarly, the great majority of courts examining the question of how best to characterize the WARN Act and its remedies for purposes of finding an appropriate statute of limitations have shared the understanding that claims arising under the Act most closely resemble claims arising under the laws of contract and tort—actions clearly historically legal in character and clearly offering a jury trial. *See, e.g., United Paperworkers Int'l Union & Its Local 340 v. Specialty Paperboard, Inc.*, 999 F.2d 51, 57 (2d Cir. 1993); *see also Staudt v. Glastron, Inc.*, 92 F.3d 312, 316 (5th Cir. 1996); *Aaron v. Brown Grp., Inc.*, 80 F.3d 1220, 1226 (8th Cir. 1996); *Frymire v. Ampex Corp.*, 61 F.3d 757, 764 (10th Cir. 1995). Why it might make good sense to conceptualize the Act and its remedies as largely legal for purposes of the limitations question but strictly equitable for the jury question is a question left open by both the parties and the case law—but presumably until that question has been answered, consistency and conceptual clarity suggest the better course is to stick with the settled understanding. *See, e.g., City of Monterey v. Del Monte Dunes at Monterey, Ltd.,* 526 U.S. 687, 726 (1999) (Scalia, J., concurring) (noting "the burden should be upon" the proponent of "different approach[es]" to explain why divergence is appropriate). Perhaps for all these and other reasons, various courts have readily permitted jury trials for WARN Act claims without any need for examination of whether the jury trial right was actually afforded. *See generally, e.g., Local Union No. 1992 of the International Brotherhood of Electrical Workers v. The Okonite Co.*, 358 F3d 278 (3d Cir. 2004); *Hollowell v. Orleans Regional Hospital LLC*, 217 F3d 379 (5th Cir. 2000); *cf. Andrews Int'l,* 2013 WL 12107630, at *7 (declining to remove WARN Act fact question "from the purview of the jury"); *McCaffrey v. Brobeck, Phleger & Harrison, L.L.P.*, 2004 WL 345231, at *3 (N.D. Cal. Feb. 17, 2004) (noting factual dispute arising from WARN Act claim was "a question for the jury"). But more tellingly, various courts addressing the question more directly have observed the statutory

language, the legislative history, and the relevant history all counsel in favor of a conclusion that an action arising under WARN "is a legal action which has legal remedies" and thus brings with it a Seventh Amendment right to jury trial. *See, e.g., United Steelworkers of Am., AFL-CIO-CLC v. Dietrich Indus., Inc.*, 1994 WL 661193, at *1 (N.D. Ala. June 29, 1994); *see also Bentley*, 861 F. Supp. at 68–69.

Based on the WARN Act's linguistic clues, the Ninth Circuit's characterization of the Act's purposes and remedies, the legislative history, the settled understanding in the case law that the WARN Act most closely resembles longstanding state actions offering legal remedies, and the general historical practice of permitting jury trials for WARN Act claims, the court cannot conclude Plaintiffs are not entitled to a jury trial here. The court will deny Defendants' motion to strike Plaintiffs' jury demand.

## IV. CONCLUSION

Given the various remaining issues of material fact, Plaintiffs' motion for summary judgment (ECF No. 162) is **DENIED** and Defendants' motion for summary judgment (ECF No. 172) is **DENIED**. For the various reasons set forth above, Defendants' motion to strike jury demand (ECF No. 166) is **DENIED**.

**SO ORDERED.**



**/s/ Frances M. Tydingco-Gatewood**
    **Chief Judge**
**Dated: Sep 30, 2017**